1

1  UNITED STATES DISTRICT COURT.

2  EASTERN DISTRICT OF NEW YORK

3  - - - - - - - - - - - - - - X

4  UNITED STATES OF AMERICA,  :
                                        10-CR-687
5
           -against-                    United States Courthouse
6
                              :         Brooklyn, New York
7
   MARK THOMPSON,
8
              Defendant.
9                             :         January 13, 2011
                                        10:30 o'clock a.m.
10 - - - - - - - - - - - - - - X

11    TRANSCRIPT OF SENTENCING
      BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
12    UNITED STATES DISTRICT JUDGE

13    ATTORNEYS FOR GOVERNMENT:
      LORETTA E. LYNCH
14    UNITED STATES ATTORNEY
      BY:  AMIR TOOSSI
15    Assistant United States Attorney
      271 Cadman Plaza East
16    Brooklyn, New York 11201

17    ATTORNEY FOR DEFENDANT:
      ERIC CREIZMAN, ESQ.

18

19

20  Court Reporter:
    Marsha Diamond
21  225 Cadman Plaza East
    Brooklyn, New York
22  TEL: (718) 613-2489
    FAX: (718) 613-2369

23
        Proceedings recorded by mechanical stenography,
24  transcript produced by CAT.

25

1          THE CLERK:  United States versus Mark Thompson.
2   Docket No. 10-CR-687.

3          Counsel, please state your appearances.

4          MR. TOOSSI: Amir Toossi, for the government. Good
5   morning, Your Honor.

6          MR. CREIZMAN: Good morning, Your Honor.
7   Eric Creizman, appointed counsel for Mr. Thompson, from
8   Gibson, Dunn, and with me at counsel table is Kimberly Youhas
9   who has passed the bar but not admitted.

10          THE COURT: Come on up and join us.  Congratulations.
11   All right.

12          MR. TOOSSI:  Your Honor, this case is on for
13   sentencing and so I know it's unusual for the case to appear
14   for the first time before you for sentencing but I understand
15   that you spoke with Judge Amon about bringing this case for
16   sentencing here.

17          THE COURT:  Yes, I agreed to sentence.

18          MR. TOOSSI:   Right.  So I could go through just
19   procedural history for this case and if Your Honor would like
20   --

21          THE COURT:  That's fine.  Why don't we do it.

22          MR. TOOSSI:  Okay. Your Honor, this case is an
23   escape case. This defendant appeared before you on a separate
24   case and was sentenced in 2005 -- hold on one second.  Let me
25   make sure that is correct.

1        THE COURT:  This is the case where I reduced the

2  period of incarceration?

3        MR. TOOSSI:   That's correct.

4        THE COURT: To 78 months.

5        MR. TOOSSI:  From 97 months.

6        THE COURT: From 97 months.

7        MR. TOOSSI:   That's correct.

8        In April of 2009 the defendant was transferred to

9  the Brooklyn Residential Reentry Center, and was supposed to

10  stay in the residential reentry sentence center until

11  October 24, 2009. However, on June 7th, 2009 he signed out on

12  a religious pass and did not return. The U.S. Attorney's

13  Office sought and obtained a warrant for the defendant's

14  arrest and he remained at large until November 18th when he

15  was arrested by the NYPD for reckless endangerment in the

16  first degree.

17        The facts of those cases are recounted in the PSR in

18  paragraph 41 and I think it is worth noting that the defendant

19  was not actually arrested on the day of his conduct, he was

20  arrested some time thereafter -- about a month and a half

21  later, but in short, he thought the police were going to

22  arrest him so he stole somebody's car and led them on a high

23  speed chase on the Staten Island Expressway, during which time

24  he was travelling in the wrong direction.

25        Now, these are all state charges and when the

4

1    defendant was arrested by the State he was not immediately

2    transferred to federal custody. Instead, he came to an

3    agreement with the Staten Island District Attorney's Office

4    and was not sentenced until August -- I'm sorry -- November of

5    2010. Between November '09 and August -- and I know the

6    timeline gets a little screwy --

7              THE COURT:  That's all right.  Go ahead.

8              MR. TOOSSI:  But he, between November 2009 and

9    August 2010, the defendant was incarcerated at Rikers Island

10   in state custody.  In August of 2010 he was writted over to

11   federal custody but he was not sentenced on the state case

12   until November, so about three months after he was writted

13   over to federal custody.

14             Now, when he was sentenced in the state he was

15   sentenced to 90 days, and obviously, that his time in state

16   custody exceeded the sentence. So the issues before the Court

17   are these, and defense counsel will clarify if I get them

18   incorrect:  From November of 2009 until February of 2010 the

19   defendant is entitled to credit to time spent in the state and

20   -- I'm sorry, let me back up. He would not be entitled to any

21   credit towards his federal sentence, according to the B.O.P.,

22   because he was in state custody serving a state sentence.

23   However, after those 90 days ran, between what I calculate as

24   February 16th of 2009 to --

25             THE COURT:  No, no, 2010.

1           MR. TOOSSI:    2010. Thank you, Your Honor. 2010.

2   February 16, 2010 until August 26th, 2010 he could receive

3   credit for that time spent in custody towards --

4           THE COURT: That's about six months.

5           MR. TOOSSI:   Six months.

6           THE COURT: So where was he during this period he was

7   in state custody?

8           MR. TOOSSI:   He was in city custody.

9           THE COURT:  But he had already, in effect, fulfilled

10  his obligation on a state sentence of 90 days; is that going

11  to be your position?

12          MR. CREIZMAN:  That -- yes, yes, Your Honor.

13          THE COURT:  Okay.

14          MR. TOOSSI:   So they're two different issues in

15  terms of federal sentence now. There is the issue of the

16  sentence that you gave the defendant in 2005, which would be

17  the difference -- there's a lot of math here -- the difference

18  between October 24, 2009 and June 7th, 2009.  That being the

19  time that he was supposed to --

20          THE COURT:  I'm sorry. From October.

21          MR. TOOSSI:   I'm sorry.   I did the second date

22  first. Between June 7, 2009 and October 24, 2009, which was

23  the time that he was supposed to be in the Brooklyn

24  Residential Re-Entry Center.

25          THE COURT: From June until?

1          MR. TOOSSI:   October.

2          MR. CREIZMAN:   He had served some time in the

3    residential center, I believe, before his release -- his

4    escape.  Sorry.

5          THE COURT:  What was the day he was supposed to get

6    out of the residential center?

7          MR. TOOSSI:  October 24th and he escaped on

8    June 7th.  So those are the two dates.

9          THE COURT: When did he arrive there?

10         MR. TOOSSI:   April 28th.

11         Now, he also will lose good time credit.  So that

12   amount -- that four months is -- that's what the B.O.P. has

13   informed me.  The time remaining on his sentence has not yet

14   been calculated by BOP. It will be, at least, four months and

15   then there will be some good time credit lost.  So their back

16   of the envelope, and just for Your Honor's information in

17   trying to devise a sentence on this case, their back of the

18   envelope math indicates that he will probably serve seven more

19   months on this sentence.

20         MR. CREIZMAN:  Your Honor, just to interject, we

21   have looked up the statutes, we have contacted the Bureau of

22   Prisons General Counsel's Office. It seems to me, and based on

23   what we've read, there's no guarantee that he will lose his

24   good time credit. There's no -- you know, it has yet to be

25   calculated, and I'm not sure what the source of Mr. Toossi's

1  calculations are.

2              MR. TOOSSI:   Well, the fact --

3              THE COURT:  Just hold on here.  He's still serving a

4  sentence, correct, on the 2005 conviction?

5              MR. TOOSSI: He owes time.

6              THE COURT:  He owes time.  Right.  So how long has

7  he been in federal custody since the escape?

8              MR. TOOSSI:   August 26th until today.  So a little

9  under five months. A little under five months.

10             MR. CREIZMAN:  Isn't it six months?

11             MR. TOOSSI:   No. September, October, November,

12  December.

13             THE COURT: Well, wouldn't it be useful for us to get

14  this information from the Bureau of Prisons before I sentence

15  him?

16             MR. TOOSSI:   My understanding is that they will --

17  my understanding from them is that they -- the Bureau of

18  Prisons itself does not, like the Northeast Quadrant, does not

19  make that determination.  He has to go to Texas before --

20             THE COURT:  You mean his papers?

21             MR. TOOSSI:  His papers have to go to Texas before

22  they'll make that calculation. Mr. Creizman is correct that it

23  is not an absolute certainty that he would lose his good time

24  credit but --

25             THE COURT: Well, I'd take it away from him in an

8

1    instant.

2           MR. TOOSSI: I think that is a safe assumption,

3    Judge.

4           THE COURT:  The problem is that, you know, here's

5    someone who asked for and received a truncated sentence, he

6    was put into a halfway house, and then he decided it wasn't

7    good enough to get time off his sentence, it wasn't good

8    enough to go to a halfway house, he had to escape. So, you

9    know, there's just so much you can do to help people. So what

10   do you propose?  What is this all about?

11          MR. TOOSSI: Is that a  --

12          THE COURT: That's to you.

13          MR. TOOSSI: That's to me.

14          THE COURT:  I have to do a sentencing here but on an

15   escape.  Why don't I just sentence him on the escape and let

16   the Bureau of Prisons work out the details.

17          MR. TOOSSI:  That would be my position.

18          THE COURT: I'm not the Bureau of Prisons and they

19   don't take away his good time, well, that's their decision.

20   I'm not the Bureau of Prisons, I've got an opinion, as you

21   just heard, but I'm not the Bureau of Prisons and I'm not

22   going to tell them what to do.  They wouldn't listen anyway.

23          MR. TOOSSI: The one thing -- the reason why

24   Judge Amon wanted the case to be before Your Honor was only

25   this, was that when it does go to Texas the Bureau of Prisons

1  will send Your Honor a letter, I believe, called a Barton

2  letter where they will ask whether they can credit the time

3  that he owes on your sentence from 2005 to the time that he

4  spent in state custody.

5          THE COURT: So when they send me the letter I'll

6  decide.

7          MR. TOOSSI:   But that was why Judge Amon --

8          THE COURT: I appreciate that.  I spoke to her about

9  it. I'm happy to sentence the defendant on the escape. I'm

10 disappointed, obviously, with the defendant, that the

11 defendant screwed it up -- to use the vernacular, yes.

12         MR. CREIZMAN:  May I be heard?

13         THE COURT: Of course.

14         MR. CREIZMAN: Thank you.

15         When we -- before we had our hearing before

16 Judge Amon, under the plea agreement the government and the

17 defense both agreed that the appropriate guidelines range was

18 eight to 14 months.  The issue was going in whether both us, I

19 think, were mistaken about whether the Bureau of Prisons would

20 credit the state time towards his --

21         THE COURT:  All the state time?

22         MR. CREIZMAN:  Well, some of the state time, the

23 state time over and above the 90 days towards his sentence.

24         THE COURT: The six months you mean?

25         MR. CREIZMAN:  There was -- yes, the six months,

1    yes.

2            THE COURT: From 2/16/10 to 8/26.

3            MR. CREIZMAN:  Correct.  I moved for a below

4    guideline sentence. Now, that it's been established that the

5    six months can count towards his sentence in this case, and

6    he's served almost another five months, we are within the

7    guideline range, and the government under the plea agreement

8    is not able to argue where in the guidelines range it would

9    fall, and I want to also say what Mr. Thompson has done since

10   that incredibly terrible misjudgment -- terrible judgment that

11   he exercised in escaping, when he was arrested by this state

12   -- by the New York City Police Department, he started to

13   provide information to the Staten Island Direct Attorneys

14   Office.  Based on the information he provided they reduced his

15   -- basically they gave him a deal which would allow him to

16   serve a year in jail. He further, at great risk to himself,

17   went into prison and wore a wire and tried to elicit

18   incriminating information from a very --

19            THE COURT: Don't give me details in open court.

20            MR. CREIZMAN:  Okay.

21            THE COURT:  He cooperated.

22            MR. CREIZMAN:  In addition to that, he has hope, and

23   he has the will now.  He spent most of his life in prison --

24   most of his adult life in prison, and you know, we received a

25   letter from the mother of his children who said -- who works

1   at a job placement facility, she's a supervisor, and she has

2   promised to help him get appropriate employment, and

3   Mr. Thompson's dedicated to that, and I think he's

4   demonstrated over this past year that he is a changed person,

5   that he's tried to make up for what he did. The state charge

6   was not -- you know, what he did in escaping and also being

7   arrested for the state crime, those were bad -- those were bad

8   acts.  There's no question about it, but the state interests

9   -- the state believed that its interests were satisfied by the

10  90 day sentence based on what Mr. Thompson did.  So my point

11  is that -- and in addition, there was a certificate of

12  disposition that recommended that the state sentence be served

13  concurrently with the federal sentence.  That's not,

14  obviously, binding on this Court, but if you were to add he's

15  actually served eleven months, if you add three, we are at the

16  top of the guidelines range. You know, we could add time for

17  his previous sentence, but I'm not sure that a couple of

18  months or maybe, you know, four months, whether it's six

19  months is going -- is necessary at this point. I think

20  Mr. Thompson based upon the 3553 (a) factor that I analyzed in

21  my brief, I think he should be released and released today. I

22  think he's ready to be released today, and with proper

23  probation, and supervision, even electronic monitoring, I

24  think he would do well.

25          His parents are ill.  They are in this courtroom.

1   They are elderly.  They need help getting to surgery and they

2   both have surgeries coming up.  He could be a great help to

3   them, and I think, you know, he is inclined to do that.  He

4   wants to do that, and probation is not a light sentence at

5   this point. Probation can be very difficult and he could have

6   a difficult home detention sentence.  So we are asking that

7   Mr. Thompson be released today.

8           THE COURT: Looking back at 2005 -- he's on five year

9   supervised release assuming, you know, he finishes his

10  sentence on that crime, right?

11          MR. CREIZMAN:  Yes.

12          THE COURT:  So he's facing five years.  If I release

13  him today he's still facing five years of supervised release

14  on the original charges of 2005, so he's not getting sprung to

15  freedom without limitations no matter what I do; isn't that

16  right?

17          MR. CREIZMAN:  That is correct. That is correct.

18          THE COURT:  I'm just pointing that out for everyone

19  to hear. Whatever I do about his incarceration on the original

20  indictment he still has five years of supervised release to go

21  and you know, the tea leaves do not present a very favorable

22  prognosis.

23          MR. CREIZMAN:  All I can say, Your Honor --

24          THE COURT:  Well,  do you want me to sentence him

25  today?

1           MR. TOOSSI:   Yes.

2           MR. CREIZMAN:  Yes.

3           THE COURT:  Why don't we start the sentencing then

4    because we haven't even gotten to that. Mr. Thompson, are you

5    satisfied with the assistance that your attorney has given you

6    thus far in this matter?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT: Okay. Do you understand that this is a

9    sentencing proceeding in connection with your plea of guilty

10   before Judge Ramon Reyes to superseding count indictment on

11   November 4, 2010 charging you with escape from the custody of

12   the Attorney General; do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT: Has the plea been accepted by Judge Amon

15   or should I do that here?

16          MR. CREIZMAN:  The plea was accepted by Judge Amon

17   in the last hearing.

18          MR. TOOSSI: I don't have a specific recollection of

19   that.  My preference would be if Your Honor would.

20          THE COURT:  I will accept it.  Do you have any

21   objection to my accepting the plea a second time?

22          MR. CREIZMAN:  No objection.

23          THE COURT: And obviously, the government does not

24   and I accept the defendant's plea of guilty before Judge Reyes

25   on November 4, 2010, having previously read the transcript of

1   that proceeding. Okay.

2            MR. TOOSSI:   Thank you.

3            THE COURT: Now, let's go over the guideline

4   calculation.  Let's go over what's in the file.

5            I've reviewed the presentence investigation report

6   dated December 2nd, 2010.

7            Mr. Creizman, have you discussed that with your

8   client?

9            MR. CREIZMAN:  Yes, I have, Your Honor.

10           THE COURT:  Has he reviewed it?

11           MR. CREIZMAN: Yes, he has, Your Honor.

12           THE COURT:  Mr. Thompson, has your attorney answered

13  any and all questions that you had about the presentence

14  report?

15           MR. CREIZMAN:  Yes.

16           THE COURT: I'm sorry?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT: Okay.

19           MR. TOOSSI:   Your Honor, I notice that you are

20  holding up the original presentence report.  Do you have a

21  copy of the revised presentence report?  I am actually not --

22           MR. CREIZMAN:  Your Honor, from my understanding,

23  just to let you know, that the presentence report was revised

24  for the purposes of taking off Judge Mauskopf and replacing

25  the Judge with Judge Amon.  I have an e-mail to that effect

```
 1    from the probation officer.

 2              THE COURT: That's it?

 3              MR. CREIZMAN: I think that is completely it.

 4              THE COURT: Did you share that information with your

 5    client?

 6              MR. CREIZMAN:  I have.

 7              THE COURT: Do you have any belief there's anything

 8    else that has been changed?

 9              MR. TOOSSI:  No, Your Honor (perusing).

10              THE COURT: All right. There's a letter dated

11    December 20th from defense counsel.  Have you seen that,

12    Mr. Toossi?

13              MR. TOOSSI:  Yes.

14              THE COURT: There's a previous letter from the

15    government -- previous letter -- December 14th to which the

16    defense has replied -- replying to the defense; do you have

17    that?

18              MR. TOOSSI:  Yes.

19              THE COURT:  There's a letter submitted under seal on

20    December 10th by the defense, have you seen that?

21              MR. TOOSSI:  Yes, Your Honor.

22              THE COURT:  I also have a letter from Mrs. Ranice

23    (ph) Rivera that I have read.

24              MR. CREIZMAN:  Correct.

25              THE COURT:  All right. Am I missing anything?
```

1          MR. CREIZMAN:  No, no, Your Honor.

2          THE COURT:  Under the computation of the guideline

3    the total offense level is a seven, criminal history

4    category is four, range of incarceration is eight to fourteen

5    months in the custody of the Attorney General; does everyone

6    agree with the guidelines calculation?

7          MR. TOOSSI:   Your Honor.

8          MR. CREIZMAN:  Yes, Your Honor.

9          THE COURT:  The Court agrees as well.

10         Is there anything else in the presentence report

11   that is in error that you want to -- any issues you want to

12   raise with the Court?

13         MR. CREIZMAN:  No, Your Honor. As far as I know,

14   there are no errors and to the extent there are, they wouldn't

15   interfere with the guidelines. They wouldn't impact that.

16         THE COURT:  All right. At this point I would like to

17   hear from defense counsel as to where I should sentence the

18   defendant, taking into account the factors under section

19   3553(a) of Title 18 of the United States Code in order to

20   impose a sentence that is sufficient but not greater than

21   necessary to fulfill the purposes of sentencing.

22         MR. CREIZMAN:  Thank you, Your Honor. I already,

23   like, delivered some or probably most of my --

24         THE COURT:  You don't have to repeat yourself.

25         MR. CREIZMAN: And I'm not going to but what I do

1  want to say is that, in fact, Mr. Thompson has served close to

2  14 months in prison. Three of those months were for state

3  offense, but the Court could consider it to run concurrently.

4  I feel that that is the high end of the guideline.

5          Mr. Thompson might have extra time on his previous

6  sentence, but I think that additional prison time is not going

7  to help Mr. Thompson or society. I think that giving

8  Mr. Thompson a chance, as he has promised to deliver, you

9  know, to be a lawful member of society, to contribute to his

10 parents' support and care, for those reasons I am -- we are

11 asking for time served and a period of supervised release with

12 conditions, and as strict conditions as the Court would deem

13 proper, including home detention with electronic monitoring

14 for a period of time, and Mr. Thompson could get -- will

15 basically be able to acclimate to society while under

16 supervised release and while under the supervision of

17 probation and that's my argument, Your Honor.

18          MR. TOOSSI: Your Honor, I want to address the

19 cooperation issue first, and I've indicated this in the

20 letter, but I'm not sure it really comes across. What the

21 defendant is asking the Court to do is to downwardly departure

22 or to vary the sentence below the guidelines in part because

23 of his cooperation on two grounds. One that he cooperated at

24 all and then, two, that it indicates something about his

25 dedication to being a lawful member of society. The thing that

1   needs to be considered is that when the defendant was arrested

2   for the charges in the state he was looking at a mandatory

3   minimum of four years if he was convicted -- excuse me -- if

4   he was convicted to the D felony.  Convicted to the E felony

5   he would be looking at a mandatory minimum of three years.  He

6   did wear a wire.  I won't get into the details of the

7   cooperation, but he did cooperate in the Staten Island D.A.'s

8   Office and did decide that that was worth a 90 day sentence.

9   Had he been convicted of a felony he would be looking at an

10  enhancement in this case of four points.  That would be under

11  2P1.1B3, and his guidelines range would go to 18 to 24 months.

12  So I'm not suggesting that that should be the guideline range,

13  but the point being that he has already -- not only did he

14  receive a sentence that was well below the mandatory minimum

15  that he was facing in the state, but he also has gained a

16  benefit in this case because he didn't receive a felony

17  conviction, and that reduced his guideline range by almost a

18  year already.  And then the second point is that I think that

19  the circumstances of his cooperation indicate that this isn't

20  a desire to turn over a new leaf, this was in reaction to a

21  lengthy prison term and knowing that he was already on an

22  escape status on another case, and that he already had time

23  owed on another case. He spent the greater portion of his 20s

24  incarcerated and there hasn't been much of an impact to show

25  that his behavior is going to conform, unless he's put under

1    pressure by law enforcement.

2              So this is -- obviously, under the plea agreement I

3    can't argue where it should fall in the guidelines and I am

4    not making an argument about where it should fall in the

5    guidelines.

6              THE COURT:  Well, the six months from 2/16/10 to

7    8/26/10, that would be a deduction on any federal sentence?

8              MR. TOOSSI:  He would -- based on 3585 he would get

9    credit for that time.

10             THE COURT:  So I don't have to do that. That can be

11   done by the Bureau of Prisons.

12             MR. TOOSSI:  Actually, Your Honor can't do that.

13   That would be done by the Bureau of Prisons.

14             THE COURT:  All right.

15             MR. TOOSSI:   That calculation is done by them.

16   Obviously, Your Honor is the second sentencing judge and

17   there's nothing in the plea agreement that states that the

18   defendant would get a concurrent sentence and any

19   recommendation from the state as to a concurrent sense is not

20   binding on this Court in terms of his family.

21             THE COURT:  Concurrent as to the first three months?

22             MR. TOOSSI:   The first three months, correct.

23             THE COURT:  How long has he been in federal custody?

24             MR. TOOSSI:   Since August. So a little under five

25   months.

1          THE COURT:  Five and six is eleven. So even if I

2   give him the maximum he would only serve another three months.

3          MR. TOOSSI:  In addition to -- well, that also

4   brings up the second -- another issue which is whether this

5   term of incarceration will be concurrent or consecutive to the

6   original sentence and I would argue, Your Honor, that actually

7   you have to -- under the statute you'd have to sentence him to

8   a period of incarceration consecutive to the original

9   sentence, so it really -- I mean --

10          THE COURT:  What about the supervised release?

11          MR. TOOSSI:   The supervised release could be run

12   consecutive or concurrent.

13          So in my view, Your Honor, what we are really

14   looking at is a period of time in state custody of about six

15   months which looks like it's going to be the amount of time

16   that he owes left on his 2005 sentence, and then my argument

17   would be that he is supposed to serve whatever sentence he

18   gets on that after August.

19          MR. CREIZMAN:  Your Honor, as an initial matter, it

20   seems to me that six months in Rikers Island would be credited

21   towards a sentence here and the five months that he spent in

22   the MDC would be credited towards the sentence here.  That's

23   eleven months.  That's within the guidelines range.  I am not

24   asking for a downward departure. What I am saying about his

25   cooperation is that I think his cooperation suggests that

1  Mr. Thompson -- that the 14 months that Mr. Thompson has spent

2  in Rikers Island and in the MDC, both places considerably

3  harsher than a prison where he would actually spend; you know,

4  not a holding facility.

5         THE COURT:  You know, I wasn't obligated to lower

6  his sentence. There's nothing that said I had to give him a

7  lower sentence when he came back for resentencing. I could

8  have just left it the same.  It was a gift.

9         MR. CREIZMAN:  I understand, Your Honor.

10        THE COURT:  I'm not at all convinced that, you know,

11 he cooperated with the state because he had turned over a new

12 leaf.  He cooperated in the state because he is facing four

13 years mandatory minimum in jail. That's why he cooperated.

14        MR. CREIZMAN:  Well --

15        THE COURT:  That was a smart thing to do, but don't

16 say somehow I should take that into account when he basically

17 just gave the back of his hand to the federal court.  What do

18 you expect out of the Court?  To say thank you, you may go on

19 your way?

20        MR. CREIZMAN:  Your Honor, I don't -- I am not

21 trying to minimize.

22        THE COURT:  Well, don't because it's pretty darned

23 unacceptable. You can finish your statement.  I'll listen.

24        MR. CREIZMAN:  Thank you, Your Honor.

25        I don't believe he was facing a mandatory minimum in

1    state court of four years.  I just wanted to point that out.

2    I think that is incorrect.

3              THE COURT: All right.

4              MR. CREIZMAN:  In addition, I also don't believe

5    that any statute requires you, Your Honor, to sentence the

6    undischarged portion of his sentence and this sentence

7    consecutively. I don't think there's any requirement.  It is

8    not mandatory, you know. So in this case, I believe,

9    Mr. Thompson, that 3553 (a) factors can be satisfied.  Given

10   where he's spent in Rikers and MDC for 14 months, I think that

11   supervised release will give him a chance to change, to turn

12   his life around.  I don't believe that six extra months in

13   jail or four extra months in jail or three extra months in

14   jail will do anything for Mr. Thompson; whereas, if

15   Mr. Thompson is released he would be of assistance to his

16   family and he might get -- he's going to try to get a job, and

17   that could be a requirement of supervised release.

18             THE COURT: Well, you're right.  An extra three

19   months or four months or six months isn't going to do anything

20   to improve Mr. Thompson. It's called punishment. That's what

21   it is. I'm under no illusion that if I give the defendant more

22   time in jail that it is going to have some salutary affect on

23   him.  After all this, he is in criminal history category four.

24   He escaped after getting a reduced sentence from this Court,

25   he then had a state proceeding.  What else?

1          MR. TOOSSI: Your Honor, I just want to direct your

2    attention to paragraph 90 of the PSR.  The last sentence.  Per

3    guideline 5G, as in George, 1.3 C, as in Charlie, the sentence

4    for the instant offense shall be imposed to run consecutively

5    to the prior undischarged term of imprisonment for the 2005

6    sentence.

7          MR. CREIZMAN:  My understanding is that the

8    guidelines are not mandatory.

9          THE COURT:  You're correct.

10         All right.  Let me hear from you, sir.  You've been

11   standing there quietly listening to all of us.  What would you

12   like to say before I sentence you, Mr. Thompson?

13         THE DEFENDANT:  I know for one what I did was wrong.

14         THE COURT:  What did you do that was wrong?

15         THE DEFENDANT:  Leaving the halfway house.  That was

16   wrong for me to do, that I apologize to the courts, to the

17   Marshal Service, most of all my family for putting them

18   through all of this.

19         THE COURT:  Yes.

20         THE DEFENDANT:  I have been locked up my whole damn

21   life. I keep doing time.  It's not helping me.  Starting to

22   bother me mentally, every other way that is possible, you

23   know. I just like a chance to be able to take care of my mom

24   and my dad and my children, and I can get employment as soon

25   as I'm released from here.

24

1          THE COURT:  You can?

2          THE DEFENDANT:  I know that for a fact.

3          THE COURT:  What kind of employment?

4          THE DEFENDANT:  Well, working construction or maybe

5     sanitation.  I have a guarantee.

6          THE COURT:  Private sanitation?

7          THE DEFENDANT:  Yes, Your Honor.  I just, you know,

8     I have been -- feel like I've been locked up forever and just

9     --

10         THE COURT:  Well, I understand that, but a lot of

11    this is your responsibility.  You did these things.  You admit

12    you did them. Frankly, I don't want to see you again.  I want

13    you to go out and have a constructive worthwhile life. There's

14    nothing about you that makes it impossible for you to have a

15    good life. The only thing standing in the way is you. That's

16    what stands in the way. I don't understand why you did the

17    things you did, but whatever you do you are going to be under

18    the Court's supervision for the next five years.  So if you

19    mess up you are coming back and you go back to jail possibly.

20    I don't want to see that.  That's not in your interest, that's

21    not in the Court's interest, that's not in your family's

22    interest, but I am skeptical. That is why I agreed to conduct

23    the sentencing. Judge Amon indicated that she would be willing

24    to have me conduct it because I wanted to tell you that you

25    don't get it. I'd like you to get it, take care of your

1    parents, take care of your family, your own children.

2             THE DEFENDANT:  Yes.

3             THE COURT: No one wants to see you spend more time

4    in jail but it's up to you. I assure you, you come back here

5    I'll put you in jail if it's appropriate to do so. Okay.

6             Are you ready to be sentenced?

7             THE DEFENDANT:  Yes.

8             THE COURT:  All right. I sentence you to 11 months

9    in the custody of the Attorney General to run consecutive to

10   any undischarged term of imprisonment, three years of

11   supervised release, to run consecutive to any other period of

12   supervised release that has been imposed in the prior case.

13   You shall participate in outpatient and/or inpatient treatment

14   or detoxification program approved by the probation

15   department.  You are to contribute to the costs of such

16   treatment/detoxification, not to exceed an amount determined

17   reasonable by the Probation Department's Sliding Scale for

18   Substance Abuse Treatment Services, and you shall cooperate in

19   securing any applicable third party payment, such as insurance

20   of Medicaid. You are to disclose all financial information and

21   documents to the Probation Department to assess your ability

22   to pay.  You shall not consume any alcohol or other

23   intoxicants during and after treatment unless granted a

24   prescription by a licensed physician, and proof of same is

25   provided to the probation department. You shall submit to

1  testing during and after treatment to ensure abstinence from

2  drugs and alcohol.

3           You are to maintain full-time verifiable employment,

4  and/or participate in an educational vocational training

5  program as directed by the Probation Department.

6           You shall not processes a firearm, ammunition or

7  destructive device.

8           There's a $100 special assessment, which is

9  mandatory.

10          You have the right appeal your sentence if you think

11 the Court has not properly followed the law in sentencing you.

12 Your time to appeal is extremely limited and you should

13 discuss with your attorney at once whether an appeal would be

14 worthwhile.  I note that you agree not to appeal or otherwise

15 challenged the sentence if this Court's sentence is 14 months

16 or below.  That's set forth in your plea agreement.

17          Now, let me just say this.  Is there anything else?

18 There's no open count?

19          MR. TOOSSI:   No.  It is a one count indictment.

20          THE COURT:  Let me just say this on the supervised

21 release.  If you turn your life around and probation comes in

22 here in three years and says to me that Mr. Thompson, he has

23 made tremendous progress, I'll consider reducing your period

24 of supervised release.  I have no desire to have you continue

25 that for forever. So that is up to you.

1            In addition, I want to see Mr. Thompson one year

2     from the beginning of supervised release.  I want a report

3     from the Probation Department after one year, so that I know

4     that Mr. Thompson has fulfilled his commitments to his family

5     and to himself and I'm going to leave it to the Bureau of

6     Prisons to figure out the rest.

7            Anything else?

8            MR. TOOSSI:   No, Your Honor.

9            MR. CREIZMAN:  One moment, Your Honor.

10           (Defendant and counsel conferred)

11           Your Honor, my client wishes to serve the rest of

12    whatever sentence is determined at the MDC and I would think

13    that he would but he's worried about his safety.

14           THE COURT: I recommend that whatever is left on the

15    defendant's prison sentence be served in the MDC.  I don't

16    think there's that much left.

17           MR. TOOSSI:   I anticipate he will probably be

18    released in July.

19           THE COURT: In July?

20           MR. TOOSSI:  That's my calculation.

21           THE COURT:  All right.  I don't want him released in

22    July.  I thought it was another couple of months. He should

23    get credit.  He needs to get credit. He should get credit for

24    the six months past the 90 days, right, and then for the five

25    months --

1          MR. TOOSSI:   Right.  What I have --

2          THE COURT:  Five and six is eleven.  I thought that

3    would basically do it.  Oh, you're saying he might end up

4    being charged for good time that he was given previously?

5          MR. TOOSSI:   Yes, I'm anticipating an extra two

6    months, but I mean I could be wrong about that, but just to

7    let Your Honor know this is my back of the envelope

8    calculation.  My calculation is that he'll not get credit for

9    his state time up until February, which is the 90 day

10   sentence. Then he'll get -- if you figure that he'll get six

11   months plus the eleven months that --

12         THE COURT:  Plus the five months -- plus the

13   eleven months.

14         MR. TOOSSI:   The eleven months that you just

15   sentenced him to, plus the undischarged time on his 2005

16   sentence.  So I'm saying six months.  It is four plus the two.

17   I am anticipating two months of loss of good time.  So it will

18   come out to seventeen months, and actually will be in June of

19   this year that he would be released.  That's what I am

20   anticipating the BOP is going to do.

21         THE COURT: It is too complicated.  I'm going to

22   change. I'm going to sentence him concurrently and not

23   consecutively to the eleven months, all right,  then you

24   figure it out.

25         MR. TOOSSI:   All right.

1      THE COURT:  I stopped figuring out good time and

2  other issues when I left the State Attorney General's Office.

3  I didn't understand it then, I don't understand it now. That's

4  for someone else to figure out, but here's the point. I'm

5  going to do this because I want you to have a chance, but I

6  want you to take advantage of it and not blow it the way you

7  did the last time I gave you a chance. Understand?

8      THE DEFENDANT:  Yes, Your Honor.

9      THE COURT:  The sentence that I have imposed is

10  sufficient but not greater than necessary to fulfill the

11  purposes of sentencing as I am required under 18 United States

12  Code section 3553 (a). Have I missed anything?

13      MR. TOOSSI:   No, Your Honor.

14      MR. CREIZMAN:  I have to admit that I'm just

15  somewhat confused.

16      THE COURT: Oh, yes?

17      MR. CREIZMAN:  After the calculation --

18      THE COURT: The calculation is that the sentence that

19  I impose is to run concurrently with any other federal

20  sentence.  The undischarged part of the original seventy-eight

21  months will be calculated along with this.  So the time that

22  the defendant has spent in federal prison beginning on 2/16/10

23  will be taken into account; isn't that right?  That's my

24  understanding, but the rules of the Bureau of Prisons as to

25  how they do the computation, you will discuss with them.

1          MR. CREIZMAN:  Okay. Understood.

2          THE COURT:  Anything more?

3          MR. CREIZMAN:  No.

4          THE COURT:  Should I order lunch?

5          MR. CREIZMAN:  No, Your Honor.

6          THE COURT: I'm serious.

7          MR. TOOSSI:   I don't think there's another issue.

8          MR. CREIZMAN:  No.

9          THE COURT: Let's hope that it all works out.

10          MR. CREIZMAN:  Thank you.

11          THE COURT:  Have a nice day.

12          Thank you, deputies.

13          (Proceedings adjourned as above set forth)

14               *  *  *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25