1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - X

3    UNITED STATES OF AMERICA,    :    10-CR-687 (CBA)
                                  :
4                                 :
                                  :
5         -against-              :
                                  :    United States Courthouse
6                                 :    Brooklyn, New York
                                  :
7                                 :
     MARK THOMPSON,               :    December 21, 2010
8                                 :    9:30 a.m.
             Defendant.           :
9    - - - - - - - - - - - - - - X

10            TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
11            BEFORE THE HONORABLE CAROL B. AMON
                  UNITED STATES DISTRICT JUDGE
12
                       A P P E A R A N C E S :
13
     For the Government:    LORETTA E. LYNCH, ESQ.
14                          United States Attorney
                            Eastern District of New York
15                          271 Cadman Plaza East
                            Brooklyn, New York 11201
16                     BY:  AMIR TOOSSI, ESQ.
                            Assistant United States Attorney
17

18   For the Defendant:     GIBSON, DUNN & CRUTCHER, LLP
                            200 Park Avenue
19                          New York, New York 10166-0193
                       BY:  ERIC CREIZMAN, ESQ.
20

21   Probation:            Cheryl Fiorillo

22   Court Reporter:       Marie Foley, RMR, CRR
                           Official Court Reporter
23                              Telephone: (718) 613-2596
                                Facsimile: (718) 613-2648
24                              E-mail: Marie_Foley@nyed.uscourts.gov

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

Proceedings                                                    2

1              (In open court.)

2              (Judge Amon takes the bench.)

3              (Defendant enters.)

4        COURTROOM DEPUTY:  United States against Thompson.

5        Please state your appearances for the record.

6        MR. TOOSSI:  Amir Toossi for the Government, and

7   Cheryl Fiorillo from Probation.  Good morning, your Honor.

8        THE COURT:  Good morning.

9        MR. CREIZMAN:  Good morning, your Honor.  Eric

10  Creizman, CJA appointed counsel for Mr. Thompson from Gibson,

11  Dunn and Crutcher.

12        THE COURT:  Good morning.

13        I think the first matter that we need to take up is

14  the plea before the magistrate judge.

15        MR. CREIZMAN:  Yes, your Honor.

16        THE COURT:  I just wanted to see a plea agreement.

17  The Government is providing me a copy.

18              (Pause in the proceedings.)

19        THE COURT:  I've reviewed the minutes.

20        Have you reviewed the minutes, Mr. Toossi?

21        MR. TOOSSI:  Actually, I apologize.  No, your Honor,

22  I haven't.

23        THE COURT:  Pardon me?

24        MR. TOOSSI:  I did not, no.

25        THE COURT:  Mr. Creizman, have you reviewed the

1   minutes?

2           MR. CREIZMAN:  Your Honor, I don't believe I have.

3           THE COURT:  The only concern I have, and it's

4   entirely possible that I missed it, but I don't believe that

5   the defendant was advised of his appeal waiver.

6           MR. TOOSSI:  I believe he was.  I don't have any

7   specific recollection of that.

8           MR. CREIZMAN:  I believe he was also, but I also

9   don't have a specific recollection.

10          THE COURT:  Okay.  Let me see.

11          (Pause in the proceedings.)

12          THE COURT:  I have a copy of the minutes, and I just

13  want to have the parties look at it.

14          Do you have your own copy?

15          MR. CREIZMAN:  I don't, actually.  I didn't bring it

16  here.

17          THE COURT:  It's entirely possible I missed it, but

18  I want to advise the defendant of that before I accept the

19  plea.

20          MR. CREIZMAN:  Sure.

21          THE COURT:  I could have certainly missed it.

22          (Pause in the proceedings.)

23          MR. TOOSSI:  Your Honor, it's here.

24          THE COURT:  It is there?

25          MR. TOOSSI:  It's on page ten between lines eleven

Proceedings                                              4

1    and sixteen.

2             THE COURT:  Okay.  Great.  Thank you.

3             (Pause in the proceedings.)

4             THE COURT:  No, that just says --

5             MR. TOOSSI:  That's not the plea agreement waiver.

6    That's just his waiver of rights.

7             That's the only reference to his right to appeal

8    that I can see in there.  So I think your Honor is correct; I

9    don't think he was advised of his appellate waiver that's

10   contained in the plea agreement.

11            THE COURT:  Then before I accept the plea, I want to

12   make sure that the defendant understands that.

13            Mr. Thompson, pursuant to the terms of your plea

14   agreement, you gave up another right that you had in addition

15   to your right to trial and all the other rights that were

16   addressed by the magistrate judge.  You also gave up your

17   right to file an appeal or otherwise challenge by petition

18   pursuant to 28 U.S.C. Section 2255 or any other provision the

19   conviction or sentence in the event that the Court imposed a

20   term of imprisonment of fourteen months or below.

21            What that means is ordinarily if you plead guilty,

22   that means you've admitted the crime.  You can't go back and

23   file an appeal on whether you did the crime or not, but you do

24   have a right, absent an agreement like this, to appeal your

25   sentence if you thought the court made some mistake in

Proceedings                                                     5

1   imposing your sentence.

2           Do you understand that?

3           THE DEFENDANT:  Yes, your Honor.

4           THE COURT:  But in this plea agreement, you're

5   giving up that right to appeal your sentence or the right to

6   come back later at some time when you're in custody and file a

7   habeas corpus petition about your sentence or conviction as

8   long as I give you a sentence of fourteen months or below.

9           Did you understand that at the time you pled guilty?

10  Did you know that provision was in your plea agreement?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Well, do you understand what right

13  you're giving up in connection with that as part of your plea

14  agreement?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Do you still want to pursue your plea of

17  guilty and have me accept that plea of guilty, or not?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  So you still want to plead guilty?

20          THE DEFENDANT:  Yes.

21          THE COURT:  All right.  Well, with that addition,

22  and having reviewed the plea minutes, I'm satisfied that I

23  should now accept the recommendation to accept the guilty

24  plea.  There was a factual basis for the plea, and the

25  defendant was acting knowingly and voluntarily and appears

```
                        Proceedings                     6
```

1    from the colloquy to understand his rights and the

2    consequences of his plea.  So I'll accept the plea.

3              Now, let me ask you, Mr. Creizman, have you been

4    over the presentence report?

5              MR. CREIZMAN:  I have, your Honor.

6              THE COURT:  Have you discussed it with your client?

7              MR. CREIZMAN:  I have.

8              THE COURT:  Mr. Thompson, have you read the

9    presentence report?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  And have you discussed it with your

12   lawyer?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Are you satisfied to have him represent

15   you?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Now, I received, actually, two letters,

18   a substantive letter from you, counsel, dated December 10th

19   and then a letter supplementing the basis for wanting that

20   letter sealed.

21             MR. CREIZMAN:  Right.

22             THE COURT:  Then there is yet another letter that

23   was submitted yesterday, right?

24             MR. CREIZMAN:  Correct, your Honor.

25             THE COURT:  And the Government has sent a letter

Proceedings                                              7

1   December 14th.

2           Is there any other materials that the Court should

3   have?

4           MR. CREIZMAN:  Yes, your Honor.

5           Yesterday I sent in a reply to the Government's

6   brief, and in addition, I forwarded a letter from the mother

7   of Mr. Thompson's children, a Renice Rivera, and I don't know

8   if your Honor received that.

9           THE COURT:  I don't have that.

10          MR. CREIZMAN:  If I can hand one up to your Honor.

11          (Handing.)

12          MR. CREIZMAN:  Sorry for the condition of the

13  letter.

14          I have a copy of the reply as well.

15          THE COURT:  I have the reply.  The December 20th

16  letter, correct?

17          MR. CREIZMAN:  That's correct.  From me, yes.

18          (Pause in the proceedings.)

19          THE COURT:  All right.  Do you want to be heard, Mr.

20  Creizman?

21          MR. CREIZMAN:  I do, your Honor.

22          Your Honor, this is a fairly straightforward

23  argument I have for sentencing.  Mr. Thompson cooperated and

24  provided substantial assistance to state authorities.  He wore

25  a wire while in prison in Rikers Island and taped a

Proceedings                                                    8

1    conversation with a violent felon, a gang member.  Because of

2    that substantial assistance, the assistant district attorney

3    and the district attorney's office approved that -- allowed

4    Mr. Thompson to plead guilty to a misdemeanor count of

5    reckless endangerment for a sentence of ninety days.  That

6    satisfied the city's interests in prosecuting the matter.

7            In addition to that, there is a certificate of

8    disposition pointed out by Probation in paragraph forty-three

9    of their report, that specifies that the Richmond County

10   sentence, the ninety-day sentence, should run concurrently to

11   the sentence for the instant offense.  Now, that does not

12   obviously --

13           THE COURT:  I'm sorry.  What are you referring to?

14           MR. CREIZMAN:  In addition to the ninety-day

15   sentence, there is a certificate of disposition from the

16   Supreme Court of Richmond County that, I guess, recommends

17   that the state sentence should run concurrently to the

18   sentence for the federal, run concurrently to the federal

19   sentence.

20           Now, obviously that's not binding on this court, but

21   it demonstrates that Staten Island in representing the city

22   believes that its interests were fulfilled in its prosecution

23   of Mr. Thompson by the ninety-day sentence and that it would

24   be fulfilled if that ninety-day sentence ran concurrently with

25   the sentence in this case.

Proceedings                                        9

1          We know that both the Government and the defense

2     agree that the guidelines here for this offense are eight to

3     twelve months.

4               THE COURT:  Fourteen, I think.

5               MR. CREIZMAN:  Eight to fourteen months?

6               MR. TOOSSI:  Yes.

7               MR. CREIZMAN:  Okay.  I'm sorry.  Eight to fourteen

8     months.

9               If we run the sentences concurrently and look at

10    how --

11              THE COURT:  Well, he's already served his state

12    sentence.  There's nothing to run concurrent.

13              MR. CREIZMAN:  Right.  I understand that, your

14    Honor.  But, if you run the November -- if he was in jail from

15    November 20th when he was caught for his state offense while

16    he was a fugitive, he spent eight months in Rikers Island, and

17    then another four months in the MDC.  And your Honor can

18    recognize that both of these institutions are not prison

19    camps.  They are harsh.  They are harsh institutions.

20              So, if you -- he had four months remaining on his

21    sentence when he escaped from the halfway house.  So, if you

22    take off --

23              THE COURT:  Well, yes.  What happens with that?

24              MR. CREIZMAN:  Well, I think there's a -- if he

25    serves his -- he had four months undischarged.

```
                        Proceedings                    10
```

1          THE COURT:  So how does my sentence work with that?

2          MR. CREIZMAN:  Under the guidelines, the guidelines

3    recommend that your Honor run it consec -- the undischarged

4    term run consecutively with the sentence for this offense.

5    That's what the guidelines recommend.

6          But, as I said --

7          THE COURT:  Excuse me.  I'm sorry, Mr. Creizman.

8          (Pause in the proceedings.)

9          THE COURT:  I'm sorry.  Go ahead.

10         MR. CREIZMAN:  Sure.

11         But, as I said, your Honor --

12         THE COURT:  Well, has he begun to serve the four

13   months?

14         MR. CREIZMAN:  Well, in my opinion, yes, and I'll

15   explain why.

16         I think that the eight months he spent in Rikers,

17   plus the four months in the MDC, he's already served four

18   months in the MDC.

19         THE COURT:  So that counts to the undischarged

20   portion of his sentence?

21         MR. CREIZMAN:  That could count to the undischarged

22   portion of his sentence.

23         I mean, it's within your Honor's discretion to

24   require that the undischarged portion of his sentence be

25   served consecutively.  The guidelines recommend it, but it's

Proceedings                                    11

1    not mandatory.

2          But, what I'm saying here is that if the four months

3    he has served in prison, whether or not, you know, it's state

4    prison or federal prison, what I'm arguing is that he served

5    time in prison for twelve months.  Four of those months, let's

6    count that towards the undischarged term of imprisonment, the

7    four months from the time he escaped, and then another eight

8    months in the confines of Rikers and the MDC all together, in

9    my view, I think satisfies the guideline sentence here.  Not

10   technically, but I think it should satisfy the guideline

11   sentence here.  I think it should satisfy his need for --

12         THE COURT:  Why should he get a sentence that's

13   concurrent to the undischarged portion of the sentence he was

14   previously serving?  Why does that make any sense?  Quite

15   apart from Rikers, why would that make sense?

16         MR. CREIZMAN:  Well, your Honor, I think for one

17   thing, he's served a substantial amount of time in harsh

18   prison confines.

19         Number two, he's demonstrated a willingness to turn

20   his life around by cooperating.  He's 27 years old.  He's been

21   in jail for much of his life since at least the age of 20 and

22   then before that in juvenile detention homes and so forth.

23         He has two children.  He is interested in starting a

24   new life in terms of getting a job, and the letter from the

25   mother of his children testifies to that, and she's in a job

Proceedings                                    12

1   placement company where she can actually help Mr. Thompson,

2   and Mr. Thompson's fortunate for that.

3          So, in my view, he has served hard time.  He has

4   paid for his sentence.  I think that all of the goals of

5   sentencing have been satisfied in this case by his twelve

6   months, four months in the MDC and eight months at Rikers

7   Island.

8          Over and above the ninety-day sentence imposed by

9   the state, I think that that -- whether you run that

10  concurrently or whether your Honor wants to run it

11  consecutively --

12         THE COURT:  Well, if you're talking about the state

13  sentence, there's nothing to run concurrently or consecutive.

14  He's served his state sentence.

15         MR. CREIZMAN:  I understand.

16         THE COURT:  The question would be, unless I'm

17  mistaken, in terms of concurrent or consecutive would be with

18  regard to the undischarged portion of his remaining federal

19  sentence.

20         MR. CREIZMAN:  I understand that, your Honor.

21         THE COURT:  And he would have gotten -- in other

22  words, assuming I imposed a sentence consecutive to the

23  portion, he gets credit for the four months he's already spent

24  as against his.

25         MR. CREIZMAN:  I believe that's not disputed.

Proceedings                                        13

1       THE COURT:  Before I finish, Mr. Toossi, did you

2  want to add something with respect to this?

3       MR. TOOSSI:  Right.  My understanding with respect

4  to his time that he spent incarcerated since he was writted

5  over from the state, that is not being credited towards his

6  prior conviction.  What will happen after he receives a

7  sentence in this case is --

8       THE COURT:  He's on a writ?

9       MR. TOOSSI:  Yes.

10       THE COURT:  Hasn't he finished serving his sentence?

11       MR. TOOSSI:  He was on a writ, but then we writted

12  him out of state custody because his case was still pending

13  when we writted him out.  That writ has been -- I'm actually

14  not sure what has happened to it, but it was -- hold on.  Let

15  me figure out exactly how this worked because when we writted

16  him over from state custody when he had to go back for his

17  state case, the district attorney's office in Staten Island

18  actually had to writ him back to them.  I don't believe that

19  our writ is still in effect.  I think it's moot at this point.

20       I've actually never encountered that situation where

21  we didn't return him to state custody for another reason.

22       But, in terms of the time he actually spent in MDC,

23  yes, it's been since late August.  In terms of the time

24  that --

25       THE COURT:  But was he brought back over during that

Proceedings                                    14

1    time period to the state court?

2           MR. TOOSSI:  Yes, because he was sentenced in

3    November.

4           MR. CREIZMAN:  That's correct.

5           THE COURT:  I think you all are going to have to do

6    some calculations for me, in fairness to the defendant,

7    because I don't know how all this works, and I may be thinking

8    that he's getting credit for something that he's not getting

9    credit for.

10          So I think you need to check with the Bureau of

11   Prisons to make sure with this writ situation at what point in

12   time did he begin getting credit for his federal custody,

13   because if you're talking about writs and going back and

14   forth, he might not have been getting credit since August

15   because if he had not -- when was he sentenced in the state

16   court?

17          MR. CREIZMAN:  November.

18          MR. TOOSSI:  In November.

19          THE COURT:  You believe he's been getting credit

20   since he's been here in August?

21          MR. TOOSSI:  That's --

22          THE COURT:  I don't think so.

23          MR. CREIZMAN:  I mean, that's my understanding, but

24   I could be wrong.

25          It certainly -- I think, your Honor, I think that in

Proceedings                                    15

1    terms of the time that he's spent in prison, I do think that

2    the concentrated time that he spent in prison should

3    accomplish the goals of sentencing here, whether or not it

4    counts under the Bureau of Prison rules or not.  He has

5    certainly learned his lesson.

6              THE COURT:  Well, you know, I've had problems with

7    the fact, and this is why I think it's important for someone

8    to make these calculations and to make sure they're correct.

9    Essentially, the extra time that he has spent encompasses this

10   five-month period because the ninety days he got, and that was

11   his sentence as a result of the cooperation, to the extent

12   that there's an argument that he spent extra time, it would

13   have been the five months.

14             MR. TOOSSI:  Your Honor, just going back to on

15   whether he's been getting credit since August.  It's my

16   understanding that he has because there was a permanent order

17   of detention ordered by the magistrate judge when he was

18   arraigned on the complaint back in August.  So once there was

19   actually a permanent order of detention from the federal

20   court, we weren't holding him because he was in on a state

21   sentence.

22             So, for example, if you had a witness who was coming

23   in from the state, now the only reason why we have them in

24   custody is because we're holding them for the state.  Once we

25   actually say we want to hold them, so even if the state said

Proceedings                                    16

1   that person is to be released, which is in fact in this case

2   what would have happened in November once he was sentenced on

3   the state case, he wasn't released because there was a

4   permanent order of detention on this case.  So, my

5   understanding --

6                THE COURT:  I'm not sure, though, if he is still in

7   state custody and you've got him on a writ that that is

8   correct.

9                MR. TOOSSI:  Even if there's a permanent order of

10  detention?

11               THE COURT:  Even if there's a permanent order of

12  detention.

13               I'm not sure he got that credit.

14               MR. TOOSSI:  Your Honor, if you give me five

15  minutes, I can call over to the MDC Legal and find out what

16  their position is on that.

17               THE COURT:  Well, what is the Government's position

18  about the, not legally, but in terms of the appropriate

19  sentence, about the five months that he spent in custody in

20  the state court in addition to the ninety-day sentence that he

21  got?  Why isn't that something the Court could at least

22  consider?

23               MR. TOOSSI:  Well, I certainly believe that it's

24  something that the Court should consider under 3553(a).

25               Our position is that the unique factors that led to

Proceedings                    17

1   that period of incarceration don't warrant a downward

2   departure or variance in this case, and it's just one factor

3   to consider, but it wouldn't be dispositive of what the

4   ultimate sentence should be.

5           And specifically, and I've mentioned this in my

6   letter, the conduct that led to his capture was specifically

7   dangerous, specifically malicious.  He had stolen a car.  He

8   had led the police on a chase over the Staten Island

9   expressway.  He could have killed somebody.  What the Staten

10  Island DA's office wants to do with that charge is up to them,

11  and it's separate sovereigns, obviously, but his cooperation

12  was not completed until shortly before he was brought into

13  federal custody.

14          When Mr. Creizman is talking about wearing the wire

15  in Rikers Island, that happened shortly before he was brought

16  over.  So there's only a very narrow period of time where he's

17  not in Rikers in furtherance of his cooperation.  And, if you

18  look at the dates that he's pleading guilty to these

19  cooperation agreements, they're not until -- it's not until

20  July 2nd that he actually pleads guilty to this ultimate

21  cooperation agreement which allows him to withdraw his felony

22  plea and enter into a misdemeanor plea.

23          So, the Government's position in terms of this extra

24  time is that extra time was actually spent to Mr. Thompson's

25  credit.  He was actually engaged in cooperation, and he was

Proceedings                                          18

1    given a benefit of not having to face a three-year mandatory

2    minimum in the state and in its place had gotten a ninety-day

3    sentence.  So that extra time, it's hard for me to articulate

4    this, and your Honor, I was thinking about exactly how to

5    articulate it, but the equities are not with the defendant on

6    that score just because he's already gotten a huge benefit of

7    more than two years off of a state sentence.

8              I just wanted to briefly respond to something that

9    was in Mr. Creizman's letter of December 20th.  He says that

10   the Government has not identified what credit Mr. Thompson has

11   received in the instant case.

12             Well, your Honor, if he had pled guilty to a felony,

13   he would be looking at a four-point enhancement, which would

14   dramatically change his guidelines calculation.  So, the fact

15   that he was allowed to withdraw his plea and to replead to a

16   misdemeanor, you know, brought down his guidelines by about

17   ten months on the bottom end.

18             So, has he gotten a benefit in the state?  Yes,

19   more than two years off of his incarceration.  Has he gotten a

20   benefit in this case?  Yes, almost ten months off of the

21   bottom of the guidelines.  That's a tremendous amount of

22   credit for what he's done, and, frankly, to give him credit

23   for that period is to, in practical effect, makes it so that

24   there is really no punishment for leaving the halfway house

25   and committing a crime while he was on release.  Or, not while

Proceedings                                          19

1    he was on release.  While he was on escape status.

2          So, you know, I know Mr. Creizman has characterized

3    that position as callous and draconian, but my point isn't to

4    be callous or draconian.  It's more to say that there has to

5    be a penalty.

6          Now, if the guidelines in this case were, you know,

7    120 months, I might be inclined to say yeah, give him a break

8    for the five months because he's already going to be serving a

9    substantial period of time in custody, but in this case where

10   the guideline is so low, what that really ends up being is no

11   punishment at all, and I don't think that that's appropriate.

12   That's why when balancing those factors under 3553(a), I don't

13   think that they militate in favor of a below-guideline

14   sentence.

15         MR. CREIZMAN:  Your Honor, I don't believe that the

16   Government is giving Mr. Thompson any credit for his

17   cooperation by taking that position.

18         By cooperating, he didn't get -- it's not like he

19   walked away with a benefit from the state.  He put his life on

20   the line by wearing a wire in prison, and the state who had

21   jurisdiction over this matter believed that its interests were

22   satisfied by Mr. Thompson's -- by a ninety-day sentence.

23         Mr. Toossi and the Government may not like the way

24   the Staten Island DA handled that case, and he might have

25   handled it differently, but the bottom line is that Staten

Proceedings                                    20

1   Island was the prosecuting authority, and it seems to me that

2   the Government is asking for an upward departure in this case

3   because of his behavior, you know, for the state offense.

4             The district attorney's office in Staten Island is

5   perfectly satisfied with Mr. Thompson's ninety-day sentence

6   and, in fact, is satisfied with that not reducing any sentence

7   from, you know, taking away from the federal sense.  Meaning

8   it would be just as happy with the ninety days not counting

9   towards, basically not taking away from his federal sentence.

10  Meaning, you know, count all twelve months or thirteen months

11  that he served in Rikers or the MDC towards the federal

12  sentence.

13            Now, that doesn't mean your Honor has to -- that's

14  not legally binding, but that to me says that Staten Island

15  believes that what he's done has been substantial, and people

16  who have cooperated have gotten away with a lot less and he's

17  provided substantial cooperation.

18            I think the twelve months he served here are more

19  than, or the thirteen months that he served is more than

20  enough, more than sufficient to satisfy the four goals of

21  sentencing.

22            And I'd like to add just one or two more points.

23  That his parents, who are here in this courtroom, are elderly.

24  They are in poor health.  Mr. Douglas would like to be able to

25  help them outside of prison and like to spend time with them.

```
                   Proceedings                    21
```

1          In addition to that, and as I said, he would like to

2    care for his children.  He would like to get a job.  He would

3    like to do something positive with his life.  And I think that

4    he turned a corner when he began cooperating for the state,

5    for the local authorities.  That's the first time that he did

6    that.

7          MR. TOOSSI:  I don't actually think that's true, but

8    I don't think that it's necessary for me to respond to it.

9          I'm perfectly happy to accept that it's the first

10   time, but the reality is, and I pointed this out in the

11   letter, your Honor, is that he agreed to cooperate because he

12   was looking at mandatory state jail time, upstate jail time,

13   and that was the impetus to cooperate.  It wasn't that he had

14   turned a corner.

15         In terms of if we're going to look at Mr. Thompson's

16   background.  Explicitly I'm not arguing for where it should

17   fall in the guidelines.  I'm simply arguing for a guideline

18   sentence, just to make that clear.

19         But, this wasn't the first time that Mr. Thompson

20   had led the police on a high-speed chase.  In 1999, and this

21   is in paragraph 29 of the PSR.

22         MR. CREIZMAN:  I'm sorry, paragraph?

23         MR. TOOSSI:  Twenty-nine.

24         When police officers motioned the defendant to pull

25   his car over, he ignored their directives and drove away

Proceedings                                    22

1   recklessly at a high rate of speed, in excess of 50 miles per

2   hour in a 30 mile per hour zone ignoring two stop signs and

3   weaving through traffic.  He struck another vehicle during

4   this incident, and when he was pulled over, he was found to be

5   driving without a valid license.

6          I mean, that's almost the same conduct that he

7   engaged in in 2009.

8          MR. CREIZMAN:  Well, to be fair, your Honor, he was

9   sixteen years old at the time of the incident that Mr. Toossi

10  described.

11         MR. TOOSSI:  But that's my point is that we don't

12  see an arc of development in this defendant that says he's

13  turning a corner.  We see a defendant who's not learning.

14         I also sympathize with the difficult circumstances

15  that Mr. Thompson grew up in, I certainly do, but he is, in

16  five days he will be turning 28 years old.  He's a grown man

17  and has been for ten years, and at some point, he has to

18  respond for his conduct.  I think that comes down -- that's

19  the theme of my argument, your Honor, is that there has to be

20  a penalty for what he did, and to say well, you go into state

21  custody and you cooperate, and that's a good thing, I'm not

22  saying that that's a bad thing.  I'm not saying that I don't

23  approve of what the Staten Island DA did.  My only point is

24  that there was a separate crime unto itself which was the

25  escape, which is a serious crime.  I mean, he was given a

1    chance by the BOP and he decided to flee.  I think there

2    should be a punishment for that, and I don't think it should

3    just be lumped into with his cooperation in the state case.

4              MR. CREIZMAN:  Your Honor, just a couple points in

5    response.

6              To say that Mr. Thompson cooperated because he was

7    trying to avoid a mandatory three-year sentence, that of

8    course, a reduction in sentence is always part of a motivation

9    of a cooperator.  There is no question about that.  And I

10   don't know why Mr. Toossi -- if he has information that Mr.

11   Thompson cooperated before, then he should say so, but not

12   suggest that he's done this before.

13             But, the fact of the matter is, is that the person

14   that Mr. Thompson cooperated against is now serving time in

15   federal custody partially because of Mr. Thompson's

16   cooperation, as I understand it.

17             MR. TOOSSI:  That's not true.

18             MR. CREIZMAN:  That's not true?

19             MR. TOOSSI:  That's not true.

20             MR. CREIZMAN:  Then my understanding is wrong, but I

21   know that he is serving time in federal custody.

22             And I also understand that the person Mr. Thompson

23   cooperated against was a person who killed a friend of his,

24   and I think Mr. Thompson realizes that the life that he needs

25   to live is not going to be with gangs.  It's not going to be

Proceedings                    24

1    successful on the streets.  I think he understands that.

2           And his girlfriend and the mother of his two

3    children has a very stable life.  She's been employed for

4    quite a while.  She puts other people into jobs, and I think

5    that she will be a very good influence on Mr. Thompson in that

6    regard when he leaves prison.

7           THE COURT:  All right.  Well, why don't I give the

8    two of you a few moments to see if you can figure out what the

9    answer to my question is because I think it's an important

10   question to have answered before we proceed.

11          I will recall the case at quarter to eleven.

12          (Case adjourned.)

13

14          (In open court at 4:00 p.m.)

15          (Judge Amon resumes the bench.)

16          (Defendant enters.)

17          COURTROOM DEPUTY:  The United States against

18   Thompson.

19          THE COURT:  All right.  Good afternoon.

20          Mr. Toossi, did you find out the answer to the

21   question?

22          MR. TOOSSI:  Yes, your Honor.  I spoke with Adam

23   Johnson, who's in the legal department at the Bureau of

24   Prisons, and he consulted with Hank Sadowski, who is the

25   regional director of the BOP for the northeast.  My

1    understanding from speaking with them is that state time is

2    not credited by the BOP.  However, the only state time that

3    the defendant served was the ninety days that he was actually

4    sentenced to.

5             So, under Section 3585, he is credited with, the BOP

6    in calculating his sentence and the amount of time he is to be

7    incarcerated, will calculate from the ninety-first day that he

8    was in state custody until the present.

9             THE COURT:  And how much time, then, has he gotten

10   credit for on the undischarged portion?

11            MR. TOOSSI:  The ninety days will take him from

12   November 18th until January 17th of this year.

13            Is that correct?   November to December -- no, I'm

14   sorry.  February 17th of this year.  So will be from February

15   17th of this year.  So then from February 17th until the

16   present, he will have the sentence on this case will -- let me

17   back up.

18            He's got two federal issues right now.  He's got the

19   sentence that he didn't complete, and he's going to -- they're

20   going to take his good time credit away.  So it's not merely

21   the four months between the June escape and the October

22   anticipated release date.  I didn't actually have BOP

23   calculate exactly how much good time he was going to lose

24   because they can't do that.  That would actually be a facility

25   in Texas that does that.  But it looks like it's going to be

Proceedings                                          26

1    about six or seven months.

2              So, the time -- they take that time and then

3    whatever he gets on this case will be basically strung out

4    from February 16th of this year and --

5              THE COURT:  So how much federal time has he served

6    already?

7              MR. TOOSSI:  February 17th until now would be --

8              MR. CREIZMAN:  Wouldn't that be over ten months?

9              MR. TOOSSI:  -- over ten months.

10             MR. CREIZMAN:  I was thinking a little bit over.

11             THE COURT:  Why were we thinking earlier -- was I

12   under a misimpression because I thought he had gotten credit

13   for only like four months.

14             MR. TOOSSI:  Well, that's -- see, that -- in my

15   prior experience with cases where a defendant is taken out of

16   custody from the state, it hasn't implicated Section 3585.  So

17   the mantra that goes around is he doesn't get credit for state

18   time.  And, in fact, that was why it was kind of difficult to

19   figure out exactly what was going to happen here because

20   people will say he doesn't get credit for state time, but

21   that's not entirely accurate.

22             For example, if the --

23             THE COURT:  When did he finish serving his

24   ninety-day sentence?   Is that February 19th?

25             MR. TOOSSI:  February 16th, yeah.

Proceedings                          27

1          THE COURT:  So that's the end of his state sentence.

2          MR. TOOSSI:  And that's the time he doesn't get

3     credit for.

4          THE COURT:  Right.  But anything after, starting

5     February 17th.

6          MR. TOOSSI:  That implicates 3585 and he does get --

7          THE COURT:  So he's in federal custody.

8          MR. TOOSSI:  Even though he's not in federal

9     custody, he gets --

10          THE COURT:  Why isn't he in federal custody as of

11     February 17th when he finished serving his state term?  Why

12     isn't he in federal custody then?

13          MR. TOOSSI:  I just want to make sure I understand

14     your question because I don't know if you mean practically why

15     he wasn't transferred over, or legally speaking why aren't

16     we -- like is it a legal fiction that he's in federal custody,

17     because it's not clear to me what -- because he wasn't given

18     that ninety-day sentence until November of this year.  It

19     works retroactively, I guess, if that makes sense.

20          MR. CREIZMAN:  If I could, I might be able to answer

21     the question because I read --

22          THE COURT:  Well, he got the ninety-day sentence.

23          MR. TOOSSI:  Right.  But he got it in November of

24     this year, and the way that the state calculated it is it's

25     basically, you know, we're sorry that you spent this much time

Proceedings                                    28

1    in jail, but your sentence was actually this.  That's what

2    they did.

3            Now, in terms of how BOP will calculate it, I mean,

4    they really could have saved us a lot of time by just giving

5    him time served, but they didn't do that.  They gave him a

6    definitive sentence.  And I spoke with the ADA to understand

7    exactly why.

8            THE COURT:  Why they do that.

9            MR. TOOSSI:  Yeah.  They were trying to help us.

10   The idea being that if it were a time-served sentence, he

11   would have to be taken back to Rikers Island for processing

12   and if it was a determinative sentence, it was cut off and he

13   was now federal custody.  There was a misunderstanding on

14   their part as to what exactly needed to be done.

15           THE COURT:  Are you positive then that he gets

16   credit?

17           MR. TOOSSI:  That's my understanding from --

18           THE COURT:  So they go all the way back up to the

19   beginning, and they give him those three months.

20           So where has he been for the remaining five months?

21   In federal custody?

22           MR. TOOSSI:  They will not -- they won't say that

23   he's in federal custody.  What they will say is that under

24   3585 he is in official detention, and the fact that he was in

25   official detention between February 16th and now, regardless

Proceedings                                    29

1   of whether it was at Rikers Island or at the MDC, that he will

2   get credit for that time, and that's because the offense

3   preceded -- the offense of this case preceded the offense in

4   that case.

5           THE COURT:  Was he under an order of detention from

6   this court?   He wasn't as of February, was he?   Or was he?

7           MR. TOOSSI:  No.  The permanent order of detention

8   was entered by the Eastern District on August 27th of this

9   year.

10          THE COURT:  So, effectively, he is now getting

11  credit for ten months, approximately ten months.

12          MR. TOOSSI:  Yes.  Yes.

13          And now there are some -- what was the word that

14  they used for it?  There is a specific type of letter.  Judge

15  Garaufis has to actually sign off on his getting credit for

16  that period of time as it applies to that sentence.

17          THE COURT:  Why does Judge Garaufis have to sign off

18  on that?

19          MR. TOOSSI:  What the BOP apparently will do is --

20          THE COURT:  Do the parties believe that under these

21  circumstances, with Judge Garaufis having to sign off on this,

22  that this case should be before Judge Garaufis?

23          MR. TOOSSI:  No, only because --

24          THE COURT:  Well, because only Judge Garaufis knows

25  if he's going to sign off on that, correct?

Proceedings                            30

1          MR. TOOSSI:  That's correct.

2          THE COURT:  And it seems like to me that this entire

3    case ought to be before Judge Garaufis because the flight was

4    from a sentence imposed by Judge Garaufis.  And that's a big

5    unknown, what Judge Garaufis will do, and it seems like to me

6    that this all ought to be in context before the same judge if

7    that unknown is out there because I may well be sentencing him

8    believing that Judge Garaufis is going to do that and then

9    Judge Garaufis might not do that.

10          It seems like to me, I have to say I spoke with

11   Judge Garaufis about this case this morning, about whether it

12   should be transferred to him.  I didn't want to hold the

13   matter up, and I was perfectly prepared to go forward with it.

14   Judge Garaufis was also prepared to take the case.

15          Based on what you've told me now, I think it makes

16   more sense to have Judge Garaufis do that as opposed to having

17   me sentence him, or my engage in sentencing under the

18   assumption that Judge Garaufis is going to do that, then Judge

19   Garaufis not do that.

20          I mean, it really plays into what the appropriate

21   sentence would be.  Do you disagree, Mr. Creizman?

22          MR. CREIZMAN:  I would talk to my client to see what

23   his position is.

24          THE COURT:  I don't know that he can oppose it.

25          MR. CREIZMAN:  Right.  But my position standing here

Proceedings                                    31

1   is that he has been incarcerated for thirteen months, and I

2   think that based on his parents' health and based on

3   everything, you know, all the circumstances that are -- that I

4   submitted in my memo, I really think that the Court could

5   decide this case under 18 U.S.C. 3553(a) without further

6   delay.

7           When I left the courtroom, Mr. Thompson's parents

8   came over to me and said, "Can you do whatever you can to get

9   him out?  We need help.  We can't walk around.  We are not

10  mobile."  The father is blind, essentially blind.

11          THE COURT:  Let me just stop you, Mr. Creizman.

12          To me it makes an enormous difference whether he

13  gets credit for this time or doesn't get credit for the time.

14  It changes the sentence, in my mind.

15          I don't think that under all circumstances that Mr.

16  Thompson necessarily, no matter what the circumstances are,

17  will walk out of this courtroom today.  So I think it's

18  significant to any judge who sentences him to have the answer

19  to this question.  I don't think his picture is such that

20  based on his prior record, on what happened in the state

21  court, to say that no matter what he gets to go home today.  I

22  don't see it that way.  It would make a difference if he -- I

23  just think that that's a question that needs to be answered.

24  I understand your position, but I think the answer depends on

25  what happens.

Proceedings                                         32

1          MR. CREIZMAN:  Well, your Honor, I understand that.

2    And if that is an important consideration for the Court, I

3    can't oppose that, but I would say that --

4          THE COURT:  The question is whether it be -- I think

5    that because the only person who's going to answer that

6    question is Judge Garaufis, that then the entire matter ought

7    to be before Judge Garaufis.

8          MR. TOOSSI:  Your Honor, did you have any discussion

9    with Judge Garaufis about when he would be prepared to hear

10   the case?

11         THE COURT:  No.

12         MR. CREIZMAN:  Your Honor, could I make an

13   application for Mr. Thompson to be released on bail pending

14   Judge Garaufis' sentence?   He would be on home detention with

15   electronic monitoring.  He would accept, you know, all

16   conditions of release as strict as possible.  All he would

17   want to do is take his parents to the doctor, to their

18   doctors, and perhaps take his children to school and to help

19   out in that regard.

20         THE COURT:  I wouldn't be prepared to do that.

21         In having it reassigned, I'd communicate your view

22   that it needs to be done as soon as possible.

23         MR. CREIZMAN:  I would appreciate that, but if it's

24   possible --

25         THE COURT:  I just think it's something that's

Proceedings                                    33

1    really out of my control.

2              MR. CREIZMAN:  Right.

3              But, is there any package that we could --

4              THE COURT:  I don't think that's appropriate.

5              MR. TOOSSI:  May I be heard on bail, your Honor?

6              THE COURT:  Well, unless you're willing to suggest

7    that bail be granted --

8              MR. TOOSSI:  No.

9              THE COURT:  -- I don't think there's a need to be

10   heard.

11             MR. TOOSSI:  Okay.

12             THE COURT:  Let me talk to Judge Garaufis, and I

13   will just express to him, you know, I don't know what his

14   schedule is at all, but I will express to him that the parties

15   desire to have this and dealt with as expeditiously as

16   possible.  But I do think that that prong makes it difficult

17   for me to proceed.

18             MR. CREIZMAN:  If that's the case, then it would

19   seem appropriate to go before Judge Garaufis.

20             THE COURT:  All right.  Let me see, and I'll have my

21   courtroom deputy get back to you as soon as we find out.

22             MR. CREIZMAN:  Thank you, your Honor.

23             MR. TOOSSI:  Thank you, your Honor.

24             (Defendant remanded.)

25             (Time noted:  4:32 p.m.)